**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| UZMA MALIK | : | |
| 1080 Sheffield Road | : | |
| Shavertown, PA 18708 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | DOCKET NO.: 19-CV-01547 |
| v. | : | |
| | : | |
| WYOMING VALLEY MEDICAL | : | |
| CENTER, P.C. | : | **JURY TRIAL DEMANDED** |
| 1000 E. Mountain Boulevard | : | |
| Wilkes-Barre, PA 18711 | : | |
| and | : | |
| GEISINGER HEALTH SYSTEM | : | |
| 100 N. Academy Avenue | : | |
| Danville, PA 18702 | : | |
| and | : | |
| ANAND MAHADEVAN | : | |
| 1000 E. Mountain Boulevard | : | |
| Wilkes-Barre, PA 18711 | : | |
| and | : | |
| MICHAEL GREENBERG | : | |
| 100 N. Academy Avenue | : | |
| Danville, PA 18702 | : | |
| | : | |
| Defendants. | : | |

---

## THIRD AMENDED COMPLAINT

Uzma Malik (*hereinafter* referred to as "Plaintiff," unless indicated otherwise), by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      This action has been initiated by Plaintiff against Wyoming Valley Medical Center, P.C., Geisinger Health System, and individual defendants set forth in the caption (*hereinafter* collectively referred to as "Defendants") for violations of the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101 *et. seq*.), the Family and Medical Leave Act ("FMLA - 29 U.S.C. §2601 *et. seq*.), and other applicable state and federal law(s) as

outlined herein. Plaintiff asserts, *inter alia*, that she was discriminated against, retaliated against, and unlawfully terminated by Defendants from her employment as a physician. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§1331 and 1343(a)(4) because it arises under laws of the United States and seeks redress for violations of federal laws.

3.      This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.      Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

5.      Plaintiff filed 4 Charges (the latter 3 ostensibly treated as amendments) of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted her federal administrative proceedings, as to any and all claims legally requiring such administrative exhaustion, and she has timely filed a lawsuit within ninety (90) days of receiving a consolidated right-to-sue letter from the EEOC.

## PARTIES

6.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.     Plaintiff is an adult individual, with an address as set forth in the caption.

8.     Wyoming Valley Medical Center, P.C. ("Defendant Center" where referred to individually) is a hospital in Luzerne County, Pennsylvania. Its facilities and departments offer emergency, non-emergency, diagnostic, and specialized medical care.

9.     Geisinger Health System ("Defendant GHS" where referred to individually) is a non-profit, physician-led, integrated health system serving over 40 counties in Pennsylvania operating several hospitals and other medical programs throughout the Commonwealth.

10.     Michael Greenberg ("Defendant Greenberg") is a medical doctor focusing in Radiation Oncology who was at all times relevant to the allegations in this lawsuit Defendant Center and Defendant GHS's Director (a high-level manager).

11.     Anand Mahadevan ("Defendant Mahadevan") was at all times relevant to the allegations in this lawsuit Defendant Center and Defendant GHS's Chairman of Plaintiff's department (a high-level manager).

12.     Defendant GHS owns and operates Defendant Center, as well as all other programs and hospitals in its purview. Defendant GHS sets directives, controls activities within each hospital (such as Defendant Center), sets goals, oversees financial aspects of the business, and develops uniform rules, regulations and policies within Defendant Center and its other operations. Defendants are a single enterprise, joint employer, or single employer of Plaintiff for the purposes of the instant action, as Defendants share resources, have overlapping management, and operate as a unified operation.

13.     By way of additional specificity, Plaintiff at all times considered herself to be an employee of both Defendant Center and Defendant GHS.  While Plaintiff directly worked at Defendant Center and supervisory staff therein, it was Defendant GHS that: (1) directly gave her *a written offer of* employment; (2) provided her policies and *an agreement to be employed* in conjunction with her hire; (3) jointly oversaw all aspects of her employment; and (4) provided Plaintiff *with termination correspondence*, a decision overseen and participated in by Defendant GHS.  For these and previously stated reasons, both entities were Plaintiff's "employer."

14.     At all times relevant herein, Defendants acted by and through their agents, servants and/or employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

15.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

16.     Plaintiff is a 56-year-old female. She is a very well-accomplished medical doctor. In particular, Plaintiff is double board certified (in the United States and Canada) and a fellowship-trained cancer physician specializing in Radiation Oncology and treatment of cancers affecting the prostate, breast and brain (among other aspects of related testing, treatment, and care).

17.     Plaintiff was hired by Defendants on or about January 4, 2006; and in total, Plaintiff was employed with Defendants for approximately 13.5 years (until termination, as discussed *infra*).

18.     Plaintiff was considered to work within Defendants' Cancer Institute, focusing in Radiation Oncology.

19.     At all times relevant to allegations in this lawsuit and through termination, Plaintiff and other similar physicians were overseen by Dr. Anand Mahadevan ("Defendant Mahadevan"). Defendant Mahadevan was and upon information and belief remains Defendants' Chairman of Radiation Oncology.

20.     Plaintiff has a long history of suffering from disabilities, but *none of which* prevented Plaintiff from performing her work, duties or other requirements as a physician (inclusive of being able to provide wonderful patient care). Plaintiff has been medically treated for, *inter alia*:

> (A) Extensive Tarlov Cyst problems, cysts in the base of Plaintiff's spine, requiring monitoring, medical treatment, and surgery;
>
> (B) Lumbar disc disease with annular fissures;
>
> (C) Fibromyalgia; and
>
> (D) Other back and limb problems relating to neuropathy, radiculopathy, radicular pain, and complications from various back, spinal, and lumbar problems (such as ongoing discomfort, severe pain, lack of sleep at times, genitourinary issues, and other negative impacts on Plaintiff's muscular system).[1]

21.     Plaintiff has been treated for these permanent medical conditions (which are disabilities) for over 10 years; and they at times, limit Plaintiff from a wide array of normal life activities.

---

[1] Plaintiff's medical history is substantial, and this summary is only intended to identify the general nature of Plaintiff's health problems. It is not to identify every form of treatment, diagnosis, or complication which will be better reflected in Plaintiff's medical records.

**[1]** **<u>Plaintiff seeks relief in this lawsuit for her discriminatory and retaliatory removal from the position of Director, Radiation Oncology effective early 2018 and non-hire as Regional Director in mid-2018.</u>**

22.     Plaintiff took an approved medical leave of absence from in or about early February 2018 through on or about May 6, 2018 (hereinafter the "February-May 2018 FMLA leave"). Plaintiff physically resumed working for Defendants on or about May 7, 2019 following her aforesaid February-May 2018 FMLA leave (some of which was comprised of extended medical leave).

23.     The February-May 2018 was time Plaintiff took off from work, which was protected under federal law (the Family and Medical Leave Act – "FMLA"), in addition to some extended medical leave (approved by Defendants' management). It was for serious health conditions, and Plaintiff was qualified for protections under the FMLA. Plaintiff's time off from work under the FMLA was simultaneously and conterminously protected under the Americans with Disabilities Act ("ADA") as a medical accommodation.[2]

24.     In the approximate 6 months leading up to Plaintiff's February-May 2018 FMLA leave, Plaintiff discussed with Defendants' management: (1) her specific health conditions; (2) anticipated medical leave (FMLA and ADA protected, as aforesaid); and (3) her anticipated treatment / therapy regimen. This reasonably expected discussion was for coordination and planning within Plaintiff's department.

25.     **_After_** Plaintiff had discussed her anticipated FMLA leave **_and_** medical accommodation needs for many months, Defendants announced (on or about January 25, 2018)

---

[2] *See e.g. Bernhard v. Brown & Brown of Lehigh Valley, Inc*., 720 F.Supp.2d 694 (E.D. PA 2010)(time off from work, even up to 3 months can constitute a reasonable accommodation under the ADA); *Conoshenti v. Public Serv. Elec. & Gas Co*., 364 F.3d 135 (3d Cir. 2004)(federal courts have outlined that medical leaves are a form of reasonable accommodation under the ADA); *Shannon v. City of Philadelphia*, WL 1065210 (E.D. Pa. 1999)(time off from work for an extended period of time is a reasonable accommodation under the ADA).

that Plaintiff's then position of Director, Radiation Oncology, was being eliminated through a restructuring effective January 31, 2018. This announcement was *approximately a week* before Defendants knew Plaintiff's February-May 2018 FMLA leave was to commence.

26.     The sole rationale given to Plaintiff for her position removal as "Director" was job elimination and restructuring. Her removal as Director was not performance or misconduct related.

27.     During and towards the end of Plaintiff's February-May FMLA leave, Plaintiff came to learn that Defendants were seeking to fill *virtually the identical job* Plaintiff had just been removed from *under the pretext* of job elimination or restructuring. Defendants slightly changed ***the job title*** of Plaintiff's prior primary job, and they advertised to hire a *Northeast Regional Radiation Oncology Director* (as opposed to the title of "Director").

28.     By May 2018, Plaintiff specifically applied for the job position of Northeast Regional Radiation Oncology Director, which aligned with plaintiff's prior duties as a Director. Plaintiff was however not given meaningful consideration or hired for the job position.

29.     Instead, Defendant hired Dr. Michael Greenberg ("Defendant Greenberg") for the position of Northeast Regional Radiation Oncology Director, effective July 2018. Dr. Greenberg had been previously used to fill in for Plaintiff during her February-May 2018 FMLA leave, and hence Plaintiff was denied what was transparently her prior job as of July 2018.

30.     As a result of Plaintiff's *feigned* job elimination, Plaintiff was employed upon return from the February-May 2018 FMLA leave as an Associate in Radiation Oncology for Defendants. This reduced position was: (1) a demotion; (2) lesser-paying; (3) non-supervisory and less prestigious; and (4) lessened Plaintiff's overall earning power and negatively impacted

her career internally *and* externally. Plaintiff held this reduced ("Associate") position through termination (as outlined below).

31.     Plaintiff's removal / demotion and non-hire in the aforesaid "Director" positions were solely for discriminatory and retaliatory reasons, as:

> (A) Plaintiff was removed from her job under the pretext of elimination / restructuring **because of** her discussions about her health, right after discussing medical accommodation needs, and imminently before her previously discussed FMLA leave was to commence;
>
> (B) Plaintiff was *selectively* chosen as an individual for restructuring or job elimination as a pretext, as it **was not** a hospital-wide process or restructuring;
>
> (C) Plaintiff was not hired for the substantially same role she previously performed. The role was **virtually identical** in all respects with the exception that it *anticipated* the ***potential*** need for helping to establish an Oncology program at a different hospital acquired by Defendants, something Plaintiff *could have easily done* **had the need ever arisen**. However, *functionally* Defendant Greenberg performed Plaintiff's prior job position of Director; and
>
> (D) Plaintiff was more qualified than her replacement (Defendant Greenberg) for the positions (pre- and post-medical leave) denied to her for discriminatory and/or retaliatory reasons (as she previously performed the very role in the same hospital for a very long time).

> **[2] <u>Plaintiff seeks relief in this lawsuit for her non-accommodations in conjunction with her return from her February-May 2018 FMLA leave.</u>**

32.     In conjunction with Plaintiff's return to work from her February-May 2018 FMLA leave, Plaintiff sought several medical accommodations. They included but were not limited to: (a) taking a little longer of a leave than permitted under the FMLA (a well-established form of medical accommodation); or (b) starting with a slightly graduated work schedule for a short time and working up to a full schedule; or (c) being given some flexibility in hourly scheduling, the ability to come in later or leave earlier on a limited and temporary basis.

33.     Defendants did not engage in an interactive dialogue with Plaintiff about any accommodations she attempted to discuss or request upon resuming her role as of May 2018. Instead, Plaintiff's continued employment was threatened and Plaintiff was required to commence working on a full-time, unrestricted basis.

34.     Concerned about jeopardizing her employment in general, Plaintiff returned to work following her February-May 2019 FMLA leave without any medical restrictions, as Defendants – without good faith or interactive dialogue – blanketly denied very reasonable accommodations Plaintiff sought. Plaintiff performed her job well upon return, but did so in unnecessary discomfort and pain which could have been obviated with any semblance of good faith on the part of Defendants.

**[3] Plaintiff seeks relief in this lawsuit for a hostile work environment she experienced from May of 2018 through July 23, 2019 (her date of termination).**

35.     Upon returning to work in May of 2018, Plaintiff was subjected to a very hostile work environment through termination. Such discrete and non-discrete acts comprising the hostile work environment (over roughly a 14-month timeframe) included but were not limited to:

(A)  Repetitive unwarranted admonishment, such as verbal warnings, written counseling, and alleged performance improvement concerns being documented. All of this kept Plaintiff under constant concern of pretextual termination;

(B)  Continual and pervasive scrutiny, such as consistent questioning of Plaintiff, oversight over her, and discussions about or concerning Plaintiff regarding matters not addressed with Plaintiff's peers;

(C)  Continual and pervasive ostracism in that Plaintiff would be excluded by Defendants' management from discussions, meetings, or access to information she previously was privy to within Defendants;

(D)  Continual and pervasive derogatory treatment, abusive demeanor, and being degraded by management in discussions;

(E) Continual and disparate negative treatment with respect to fair use of company policies, time off from work, workplace privileges, and other forms of disparate treatment;

(F) Continual and disparate negative references about and concerning her health, and in particular, forcing her to take time off from work for negative expressed perceptions of medical treatment and/or disabilities (primarily related to a referral for medical evaluation, discussed *infra*);

(G) Many other daily, weekly, and monthly forms of negative treatment; and

(H) Fellow staff members confirmed to management that Plaintiff was being bullied / harassed in the workplace.

36.     The foregoing actions were pervasive, severe, and occurred weekly throughout Plaintiff's employment from May of 2018 through July of 2019.  And any reasonable person would have subjectively and objectively believed they were in a discriminatory **and** retaliatory hostile work environment (as the environment was premised upon Plaintiff's health, requested accommodations (a form of protected activity), and concerns of discriminatory treatment she expressed (also a form of protected activity)).[3]

37.     Defendants' above-referenced blanket denials of accommodations requested by Plaintiff, including scheduling adjustments, as well as the aforesaid hostile actions taken against Plaintiff, which occurred throughout the remainder of Plaintiff's employment with Defendants, were *at least* in part for purposes of discouraging Plaintiff from utilizing and/or requesting additional leave under the FMLA. As intended by Defendants, Plaintiff ultimately was, at times, actually discouraged from freely taking and/or requesting additional FMLA leave as a result of the chilling effects of the aforesaid actions by Defendants, including Defendant Greenberg.

---

[3] This summary of actions comprising the hostile work environment is not intended to be exclusive.  And further, all actions referenced or explained in this Complaint even outside of this particular section also comprised the overall hostile work environment.

**[4]** <u>**Plaintiff seeks relief in this lawsuit for Defendants' failure to remedy her hostile work environment and many other adverse actions she was experiencing despite her complaints to all levels of Defendants' management.**</u>

38.     Plaintiff engaged in many protected activities by complaining of discriminatory and retaliatory treatment from May of 2018 through July of 2019.  Examples are as follows:

(A)     Plaintiff expressed **<u>many</u>** **<u>verbal</u>** complaints of discriminatory and retaliatory treatment to Defendants' management and human resources personnel from May of 2018 through July of 2019.

(B)     Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC"), a federal agency on or about February 7, 2019. And this Charge was dual filed with the Pennsylvania Human Relations Commission ("PHRC"). Therein, Plaintiff expressed concerns of discrimination and retaliation.

(C)     Plaintiff submitted, through her representative, a detailed letter on or about April 1, 2019 to Defendants' Executive Vice President (Amy Bradford) and Chief Legal Officer (David Felicio) outlining concerns of a pattern of discrimination and retaliation she was experiencing.

(D)     Plaintiff filed a Charge with the Equal Employment Opportunity Commission ("EEOC"), a federal agency on or about May 20, 2019. And this Charge was dual filed with the Pennsylvania Human Relations Commission ("PHRC"). Therein, Plaintiff expressed concerns of discrimination and retaliation.

(E)     Plaintiff submitted a 3-page letter to Defendants' President and CEO on or about July 6, 2019 (as well as to Executive Leadership Committee Members). Therein, Plaintiff outlined significant concerns of discrimination and retaliation that were being unremedied, as Plaintiff was told all of her concerns were in the hands of legal due to her engaging in outside legal complaints (**<u>despite that</u>** neither internal human resources or legal were undertaking any remedial actions).

39.     Plaintiff had made numerous complaints of discrimination and retaliation while in the employ of Defendants in her last approximate year of employment. And Defendants' justification for its management undertaking virtually no action (when questioned by Plaintiff) is that things were in the hands of legal.  But a business **<u>is not alleviated of its legal obligations</u>** to

correct a hostile work environment or other adverse actions being taken against its employees just because she may have simultaneously exercised external legal rights.

40.     And as explained more *infra*, Plaintiff was terminated pretextually within weeks of her most recent verbal and written complaints of discriminatory and retaliatory treatment within Defendants.

**[5]** **Plaintiff seeks relief in this lawsuit for Defendants' discriminatory and retaliatory referral of her to the Commonwealth of Pennsylvania, Department of State (and multiple divisions therein).**

41.     In early 2019, Plaintiff learned that she was referred by Defendants' management, and upon information and belief Defendant Greenberg in particular, to the Commonwealth of Pennsylvania, Department of State, Bureau of Professional and Occupational Affairs for potential discipline and/or license suspension (hereinafter "the referral").

42.     In particular, Plaintiff was falsely alleged by Defendants, by and through its management (particularly Defendant Greenberg), to have a drug addiction and/or other medical problems which may affect her licensure.

43.     Plaintiff, who had an exceptionally illustrious career and no prior licensure disciplinary concerns, was objectively **very** distressed about false allegations levied by Defendants which would impugn her reputation, limit her career mobility, and of course possibly result in some potential harm to her license.

44.     Because of the referral which was transparently discriminatory and retaliatory, and directly related to Plaintiff's medical history and medical disclosures to Defendants, it became necessary that Plaintiff be medically evaluated. As described below, this caused Plaintiff to miss **approximately 5 weeks** from work.

45.     By letter dated February 19, 2019, Plaintiff was presented with a medical review from a physician (and independent medical practice) who treated her for nearly a year and evaluated her identifying that: Plaintiff does "***not demonstrate <u>any</u> form of mental or physical impairment***" and takes only "prescribed medications on an as-needed basis" for multiple disabilities and a prior surgery. *See* 2/19/19 Medical Confirmation, attached hereto as "Exhibit A." (Emphasis added).

46.     By letter dated March 14, 2019, a 2nd separate medical practice presented Plaintiff with a medical review from a physician who treated Plaintiff for almost 2 years identifying that: Plaintiff had numerous health conditions, underwent surgery, takes medications, "has been compliant," has "***no adverse outcomes <u>or evidence of impairment</u>***," and she "has always maintained the highest standards of professionalism, and [has] personally witnessed her go above and beyond in care for her patients." *See* 3/14/19 Medical Confirmation, attached hereto as "Exhibit B." (Emphasis added).

47.     On or about April 7, 2019, Plaintiff was required to submit to a state-mandated evaluation based upon the referral. Plaintiff did so at the Richard J. Caron Foundation in Wernersville, Pennsylvania, as directed by the State. This medical evaluation was in-patient from on or about April 7, 2019 through on or about April 12, 2019 ("the April 2019 evaluation").

48.     A report was generated from the April 2019 evaluation. The report[4] identified that:

    (A)  Plaintiff has "no previous inpatient substance use or psychiatric history;"

    (B)  It is "***currently unclear***" why Plaintiff "was reported to the Pennsylvania Medical Board" by Defendants;

---

[4] The "Evaluation Summary" was prepared and dated April 12, 2019 by the Caron Foundation.

(C) The Caron Foundation contacted Defendants and was told by its "HR Department" that only "Dr. Greenberg" complained that Plaintiff "was disheveled and disoriented;"

(D) The Caron Foundation interviewed staff members of Defendants who disputed anything allegedly underlying the referral by Dr. Greenberg. In particular, staff identified Plaintiff "never appeared to be" impaired, there were "no patient complaints," no complaints by coworkers, and Plaintiff was a competent clinician, good doctor, and her "patient satisfaction scores were quite high;"

(E) The Caron Foundation interviewed Dr. Ronjon, a medical oncologist who "works with [Plaintiff] daily." Dr. Ronjon confirmed Plaintiff has "no impairment," they consistently overlap in patients and none ever complained, and she has good patient relationships;

(F) The Caron Foundation interviewed Defendants' Dosimetrist who worked with Plaintiff daily. Per the Summary: "She works closely with Dr. Malik." "She indicated she feels as though [Plaintiff] is one of the highest performers in the department," and this Dosimetrist confirmed Plaintiff never had any complaints, had no signs of impairment and her "performance had been excellent;"

(G) The Caron Foundation interviewed Wendi Newell, a radiation oncology nurse working with Plaintiff regularly. Newell confirmed she "never had concerns about [Plaintiff's] functioning and never once "observe[d] signs of impairment in the workplace;" and

(H) Pending a final evaluation, "[w]e support [Plaintiff's] return to medical practice.

49. Pursuant to the Caron Foundation's evaluation requirements, it does not permit anyone admitted to utilize prescribed "scheduled narcotics." This policy is reflected on page 2 of the 4/12/19 Caron Foundation Evaluation Summary. As a result, Plaintiff was temporarily transitioned from all of her medications to suboxone *which created adverse consequences to Plaintiff medically during her evaluation* (and resulting in a required final evaluation for release to work).

50. On or about May 7, 2019, Plaintiff submitted to another evaluation required as a result of the referral, this time being evaluated by Christopher Royer of Comprehensive

Neuropsychology Services. The 7-page report, prepared from this evaluation identified *inter alia*:

    (A) While at the Caron Foundation, "Plaintiff had "**no reported issue with addiction**," but had "difficulties" associated with being "transferred to Suboxine during the stay;"

    (B) Plaintiff "was having side effects from the Suboxone including feeling somewhat foggy" . . . and "eventually had a conjunctival hemorrhage and pressure behind the eyes;"

    (C) Plaintiff has no psychiatric history, and is in otherwise good health;

    (D) Plaintiff was administered a "Clinical Interview," and 16 other tests during her evaluation process;

    (E) Plaintiff has "no signs" of any "brain dysfunction or any neurocognitive disorder," and Plaintiff had no cognitive concerns that would prevent her from practicing medicine. And Plaintiff was recommended for a return to work.

51.    On May 17, 2019, Plaintiff released via correspondence from the Commonwealth of Pennsylvania to resume practicing medicine, as a result of satisfactorily completing all evaluations. Plaintiff returned to work shortly after the malicious referral and release to work in May of 2019.

52.    In total, 2 separate medical practices prior to April 2019 memorialized there was no medical concern or impairment concern with Plaintiff practicing medicine. In April, 2019, the Caron Foundation found no evidence of impairment and referred Plaintiff to a final evaluation for a neurocognitive review. And the May evaluation with a 4th medical provider found no evidence of any concerns medically that would prevent Plaintiff from resuming the practice of medicine.

53.    It was extraordinarily humiliating, embarrassing, and distressful for Plaintiff to spend approximately 5 days in an in-patient treatment facility for a state evaluation while being

precluded from work and facing allegations about her licensure by Defendant Greenberg. Plaintiff's entry into the evaluation required her to be strip searched institution personnel to ensure she was not trafficking narcotics. Additionally, as a direct, proximate and actual cause of Defendants' discriminatory and retaliatory referral of Plaintiff to the State for evaluation, Plaintiff suffered severe side effects from medication transitions during her evaluation due to her normal prescriptions (or any Scheduled Narcotics) being prohibited within the Caron Foundation.

54. There was **<u>never</u>** any competent (non-discriminatory or non-retaliatory) evidence of impairment, as Defendants' own Legal Counsel on behalf of Defendants' entire organization confirmed in writing on April 8, 2019:

> I plan to prepare correspondence to the state board or investigator noting that Geisinger was not a party to the complaint against [Plaintiff] and Geisinger does not endorse the complaint or its allegations. [Plaintiff] has served as a physician with Geisinger since 2006 and during that period Geisinger Clinic [has] not identified any evidence of substance abuse or impairment.
>
> *See* Written Admission of Defendant's Counsel, attached hereto as "Exhibit C."

55. The referral, which turned out to be transparently baseless, was also made **<u>despite that</u>** by late 2018 (shortly before the referral), Plaintiff was recognized by Defendants' executive management team for "being among the best in the country" for overall "patient's experience." And Plaintiff was informed she was "placed in the top ten percent in the county" as to patient improvement of experience for Defendants.

56. Despite the months of agony Plaintiff encountered with a malicious referral by Defendants' own high level management, Defendants never properly intervened, never performed an adequate investigation, never sought to subject Plaintiff to any internal or external

exam to vindicate her, refused to pay for Plaintiff's expenses associated with undergoing state-mandated exams, permitted Defendant Greenberg free reign, and did not correspond with the State of Pennsylvania until after Plaintiff was undergoing evaluations.

57.     The ***outright torture*** Plaintiff was required to undergo at the behest of a managerial agent(s) of Defendants for the false, discriminatory and retaliatory referral did not cease on May 17, 2019 as Plaintiff initially anticipated.

58.     Plaintiff learned on May 21, 2019 that she was being investigated by the Commonwealth of Pennsylvania Office of Attorney General, which was a separate department that evaluates complaints or physician referrals.  Plaintiff was required to correspond with, spend additional legal fees, and meet with an investigator as part of the related investigation of the referral.

59.     It was not until July 17, 2019 that Plaintiff was informed in writing by the Commonwealth of Pennsylvania Office of General Counsel that the agency "has completed its inquiry into the above referenced complaint alleging that [Plaintiff] is unable to practice medicine and surgery with reasonable skill and safety due to addiction to drugs or alcohol." The letter officially informed Plaintiff that the State was not proceeding with any action, admonishment or discipline of Plaintiff based upon a review of all information.

60.     Plaintiff however dealt with allegations caused by Defendants and its agents for approximately 6 months that could have resulted in discipline, suspension, or loss of license. *Such conduct is outrageous, shocks the conscience, and greatly worried Plaintiff as it would any reasonable physician*.  If ever there were a case warranting a substantial punitive verdict against corporate entities, it is this case herein.

**[6] <u>Plaintiff seeks relief in this lawsuit for Defendants' discriminatory and retaliatory suspension from employment starting on or about July 3, 2019</u>.**

61.    Plaintiff was suspended on or about July 3, 2019. This was in very close temporal proximity to her:

    (A)  Filing her 2nd EEOC Charge;

    (B)  Continued and ongoing hostile work environment;

    (C)  Making verbal complaints of retaliation and discrimination to Defendants' management and/or human resources personnel; and

    (D)  Her return from a medical leave associated with complications arising out of her aforesaid unlawful referral to the Commonwealth of Pennsylvania.

62.    On or about July 3, 2019, Plaintiff was suspended for leaving work approximately 2 hours before the end of her scheduled shift on July 2, 2019.

63.    On July 2, 2019, Plaintiff had been ill, sought to use FMLA, and she informed staff and her Operations Manager that she was leaving a little early due to not feeling well. Plaintiff in fact registered her approximate 2-hour early departure from work with Defendants' administrator as FMLA intermittent usage (federally protected time).[5]

64.    Plaintiff was suspended from July 3, 2019 through July 23, 2019 when she was informed of her termination from employment.

65.    However, before addressing Plaintiff's termination from employment *infra*, Plaintiff explains herein that her suspension was unlawful. Specifically:

---

[5] It is well established that FMLA leave is permitted for whole days*, **partial days or medical-related breaks*** under the FMLA. *See e.g. Mora v. Chem-Tronics, Inc*., 16 F. Supp. 2d 1192 (S.D. Cal. 1998)(Employees may take leave ***in any size increments*** and employers may account for the leave in the shortest period of time the payroll system uses to calculate absences). *See also Sabbrese v. Lowe's Home Centers, Inc.,* 320 F. Supp. 2d 311 (W.D. Pa. 2004) (explaining that *an employer is prohibited from counting medically necessary breaks against an employee* under the FMLA) (emphasis added); *Collins v. U.S. Playing Card Co*., 466 F. Supp. 2d 954 (S.D. Ohio 2006) (same).

(A) Plaintiff was suspended on July 3, 2019 in such haste that there was no meaningful inquiry to take such a drastic action against a near 13.5-year physician; and to state otherwise, would be ridiculous;

(B) It was obvious and readily attainable information that Plaintiff informed Defendants' Operations Manager she needed to leave a few hours early, among other staff;

(C) Other physicians had significant flexibility in breaks, departures or time off from work, such that the scrutiny of Plaintiff was absurd; and

(D) Defendants own termination letter issued on July 23, 2019 **conceded** in the very termination letter itself Plaintiff did **nothing wrong** by leaving on July 2, 2019, that it was federally-protected FMLA time usage, and any action against Plaintiff in termination had nothing to do with her leaving on July 2, 2019.

66.     Thus, Plaintiff was on suspension for nearly 20 days until Defendants devised a *totally different* reason to justify Plaintiff's termination (outlined below). Any reasonable (non-discriminatory) employer could and would have determined that Plaintiff's suspension for using FMLA time was improper within than 1 business day (and would not have suspended in the first instance). Thus, Defendants suspended and kept Plaintiff on suspension for unlawful reasons.

### [7] Plaintiff seeks relief in this lawsuit for Defendants' discriminatory and retaliatory termination of her on July 23, 2019.

67.     Plaintiff suspension effective July 3, 2019 was converted to a termination effective July 23, 2019.

68.     On or about July 6, 2019, Plaintiff had written a 4-page, very polite and succinct letter to Defendants' President and CEO outlining very professionally what she had been experiencing, explaining she was just suspended for use of FMLA, and she was concerned Defendants were hunting for any made-up rationale to terminate her. She pleaded with executive management of Defendants to intervene. Part of her letter read as follows:

> I planned to retire here, as I relocated with my entire family. Now I am suspended, and it is probably a matter of time before I am

terminated either for using FMLA this time or for some absurd rationale in the near future. No management or human resources personnel have been able to intervene. You are, as I said, my last resort – literally. Are you going to ignore this letter or respond like others that legal is handling this? Nobody addressed my concerns, so I made legal claims. Now that I have made legal claims, nobody addresses my work problems because I made legal claims. Absent you stepping in, Dr. Mahadevan will continue discriminating or retaliating against me, the department will continue to be run in shambles by him, and some excuse will made for my termination. Dr. Mahadevan has basically been running the department into the ground, not caring about rules, policies or laws, and especially not caring about the people that work under him. I am asking for your help because what I have been through has been emotionally traumatizing but not totally beyond repair.

69.     Plaintiff's July 6, 2019 correspondence was acknowledged, and she was informed by corporate human resources that her concerns were with legal. Not a single member of executive management properly reviewed anything Plaintiff complained about or sought to intervene.  And of course, a made-up rationale was ultimately given for Plaintiff's termination weeks later (***totally unrelated to the reason for her initial suspension rationale***).

70.     Plaintiff was terminated on July 23, 2019 purportedly for a notation she made in a patient's chart. And Plaintiff's termination was:

(A)  For something she had never been accused of or counseled for in over 13 years with Defendants;

(B)  For something she had never been given progressive discipline;

(C)  For medical internal documentation, not billing or other third-party data;

(D)  For doing nothing wrong, as she and other physicians noted anticipated patient visits in the same or similar manner in the past (and errors were attributable to internal coordination mistakes);

(E)  For at most what could be considered a documentation error (not an exaggerated basis for termination);

(F) For something Defendants chose to label as "Fraud" just to elevate the seriousness of the issue and to give some credence to an otherwise obvious illegal termination; and

(G) Despite that Defendants' physicians and/or nursing personnel committed malpractice, serious mistakes, or other actions **that did not result in their terminations**.

71. As is easily discerned, Defendants were going to find any reason to terminate Plaintiff, raced to suspend her for using federally-protected leave time (FMLA), did not reinstate her when it was obvious her suspension was unlawful, admitted in her termination letter there was no basis for the suspension, and kept her out of work excessively while trying to look through her patient records for a different reason to justify termination.

72. Plaintiff was terminated from Defendants for discriminatory and retaliatory reasons, including but not limited to the purpose of preventing her from taking continued FMLA leave in the future, and for and every individual act – or those viewed in the aggregate – Plaintiff believes that she is entitled to all legal and equitable damages, including punitive damages for Defendants' malice and its entire organizations' reckless indifference to her plight.

**First Cause of Action**
**Violations of the Americans with Disabilities Act, as Amended ("ADAAA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;**
**[3] Failure to Accommodate; [4] Hostile Work Environment)**
**- Against Defendants Center and GHS Only -**

73. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

74. Plaintiff asserts that numerous discriminatory and retaliatory actions were taken against her in violation of the Americans with Disabilities Act ("ADA").

75. Defendants discriminated against Plaintiff because of her actual, known and/or perceived health problems (as well as regarded-health problems). Defendants also retaliated

against Plaintiff for engaging in protected activities which include her requested accommodations, medical leave, and complaints of discriminatory or retaliatory treatment.

76. The actions by Defendants for which Plaintiff seeks relief for ***under the ADA*** are:

(1) Her non-hire for the Director-level position in mid-2018;[6]

(2) The hostile work environment and all terms and conditions denied to her disparately from in or about May of 2018 through termination;

(3) Defendants failure to provide medical accommodations or to engage in an interactive dialogue with her from in or about may of 2018 through termination;

(4) All adverse actions and/or consequences arising out of Plaintiff's referral to the State for alleged medical impairments making her unable to perform her job, including but not limited to financial loss, damage to her reputation, time off from work, costs / fees incurred, and other harm;

(5) Discipline, counseling or performance-related documentation she received which was retaliatory and/or discriminatory by Defendants;

(6) Any time in which she was involuntarily caused to be out of work, including but not limited to her suspension;

(7) Termination from employment; and

(8) Any other inaction or actions causing harm to Plaintiff which are actionable under the ADA, and which: (a) can be reasonably inferred from the allegations in this lawsuit; and (b) are within the statute of limitations for Plaintiff's administrative or court filings.

77. These actions as aforesaid constitute violations of the ADA, as amended.

**Second Cause of Action**
**Violations of the Family and Medical Leave Act ("FMLA")**
**(Interference and Retaliation)**
**- Against All Defendants -**

78. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

_____

[6] Plaintiff does not seek relief under the ADA for her removal from the Director role in or about January of 2018, but she does seek relief for this adverse action under other legal claims asserted in this Complaint.

79.     Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

80.     Plaintiff requested leave from Defendants, her employers, with whom she had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

81.     Plaintiff had at least 1,250 hours of service with the Defendants during her last full year of employment.

82.     Defendants are engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or preceding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

83.     Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block, reduced schedule, or intermittent basis.

84.     The actions by Defendants for which Plaintiff seeks relief for ***under the FMLA*** are:

    (A)  Her removal from her Director-level job in or about early 2018 <u>and</u> non-hire for the Director-level position in mid-2018;[7]

    (B)  The hostile work environment and all terms and conditions denied to her disparately from in or about May of 2018 through termination;

    (C)  All adverse actions and/or consequences arising out of Plaintiff's referral to the State for alleged medical impairments making her unable to perform her job, including but not limited to financial loss, damage to her reputation, time off from work, costs / fees incurred, and other harm;

    (D)  Discipline, counseling or performance-related documentation she received which was retaliatory and/or discriminatory by Defendants;

---

[7] Unlike her ADA claim, Plaintiff specifically seeks redress for her removal from her director-level job effective early 2018.

(E)  Any time in which she was involuntarily caused to be out of work, including but not limited to her suspension;

(F)  Termination from employment; and

(G)  Any other inaction or actions causing harm to Plaintiff which are actionable under the FMLA, and which: (a) can be reasonably inferred from the allegations in this lawsuit; and (b) are within the statute of limitations for Plaintiff's court filings.

85.  Defendants have carried out the above actions, at least in part, with the intention of discouraging and/or preventing Plaintiff from taking and/or requesting leave under the FMLA. In fact, Plaintiff was ultimately discouraged and/or prevented from freely taking and/or requesting additional leave under the FMLA as a result of the actions aforesaid.

86.  These actions as aforesaid constitute both interference and retaliation in violation of the FMLA. And the individual Defendants herein are properly included under the FMLA because they: (1) personally oversaw Plaintiff; (2) personally managed Plaintiff; (3) personally took the foregoing actions towards Plaintiff; (4) perpetuated a hostile work environment; and (5) point-blank discriminated against and retaliated against Plaintiff on an ongoing basis.[8]

**Third Cause of Action**
**Violations of the Equal Pay Act & Title VII of the Civil Rights Act of 1964**
**(Wage Discrimination and Retaliation - Related to *Gender*)**
**- Against All Defendants -**

87.  The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

88.  Plaintiff was not paid in the same manner as similarly situated male colleagues for several years leading up to her termination from employment.

---

[8] It is well established that management employees of an employer are personally liable for violations of the FMLA. *See* 29 C.F.R. § 825.104(d). *see also Haybarger v. Lawrence County Adult Prob. & Parole*, 667 F.3d 408 (3d Cir. 2012).

89.     More specifically, both in her positions of associate and director in the oncology department, there were numerous individuals who were paid more than her for performing the same and/or substantially similar work associated with said positions, including but not limited to Defendant Greenberg (performing essentially the same position Plaintiff performed, as outlined above) and Dr. Robert Rostock (an associate in the oncology department, performing the same or lesser duties than Plaintiff).

90.     Despite Plaintiff being of ***at least equal*** in qualification, level of experience, and education, male colleagues of Plaintiff were paid at higher levels of compensation.  Defendants exhibited a discriminatory level of compensation premised upon gender.

91.     Plaintiff expressed concerns of gender-based pay disparities verbally on various occasions. And she also expressed such concerns in writing by letter in June of 2018 to Defendants and via an EEOC Charge in February of 2019.

92.     Following these aforementioned complaints, Plaintiff experienced significant harassment on persistent basis, leading to the aforementioned adverse actions by Defendants, as outlined above.

93.     Plaintiff seeks relief herein for disparately paid compensation based upon gender under the Equal Pay Act ("EPA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). Plaintiff only seeks such relief to the extent each respective statute of limitations permits under applicable jurisprudence.

94.     Plaintiff also seeks relief for unlawful retaliation for all actions taken against her as alleged in this Complaint for her complaints of gender inequality and gender disparate pay, as the hostility, retaliation, and overall mistreatment occurred following her complaints of such illegalities.

95.     Plaintiff's claim under Title VII in this Count is only against Defendants Center and GHS, as Title VII does not permit individual liability.  However, Plaintiff's claim for wage discrimination under the EPA is against Defendants Center, GHS and Mahadevan, and for retaliation under the EPA is against all Defendants, including Defendant Greenberg,[9] as a result of the harassment and adverse actions she faced following her numerous complaints of unequal pay.[10]

### Fourth Cause of Action
### Negligent Supervision / Retention
### - Against Defendants Center and GHS Only -

96.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

97.     Defendants Center and GHS failed to exercise ordinary care, repeatedly turned a blind eye at concerns expressed by Plaintiff, shrugged their corporate shoulders of any responsibility and claimed Plaintiff pursued legal relief as if absolved from supervising, intervening or doing anything to remedy the work environment Plaintiff was enduring (by virtue of legal claims pending).

98.     Actions underlying this lawsuit all occurred on and within Defendant's premises, and Defendants were well aware of their obligations to manage, supervise and control their employees (including supervisory staff) *such as Defendants Mahadevan and Greenberg.*

99.     Plaintiff suffered tremendous abuse, workplace disparities, a costly and emotionally distressful 6-month period of investigation by the State of Pennsylvania, false

---

[9] Plaintiff only proceeds against Defendant Greenberg under the EPA for retaliation and not for wage discrimination.

[10] *See e.g. Burroughs v. MGC Servs.*, 2009 U.S. Dist. LEXIS 29700 (W.D. Pa. 2009)(admonishing a defendant for filing a motion to dismiss individuals under the EPA explaining case law is "overwhelming" that an employee's supervisors can be sued for such violations).

discipline, suspension and termination. Under such circumstances, a Plaintiff is permitted to proceed against her employer for negligent supervision. *See Wasseff v. NIH*, 2017 U.S. Dist. LEXIS 17221 (E.D. Pa. 2017)(denying baseless motion to dismiss and explaining a plaintiff-employee harassed by his management that is alleged to be unabated may pursue a claim for negligent supervision against his employer).

**Fifth Cause of Action**
**Defamation**
**- Against Defendants Center and GHS Only -**

100. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

101. Plaintiff has sought numerous employment opportunities following her termination from employment with third-party businesses.

102. Plaintiff has specifically been denied affiliations, privileges and employment with third-party businesses following her termination from employment because Defendants have conveyed, disseminated, and communicated false and untrue information about and concerning Plaintiff (for example, that she committed fraud while in the employ of Defendants).

103. Defendants have made false representations about and concerning Plaintiff as aforesaid by and through high-level management, human resources personnel, and without remedial guidance from Defendant's executive management - - all with the intent to harm Plaintiff further. This was done by the same personnel / management knowing of Plaintiff's legal claims.

104. Defendants actions were without privilege, made to third parties, not in the context of Plaintiff's employment, and caused Plaintiff specific injuries (loss of income, career, job opportunities, and emotional distress).

105. Upon information and belief, Defendants will continue to make false statements to third parties further limiting Plaintiff's career mobility. This Count is therefore intended to include all defamatory statements made by Defendants prior to the filing of this lawsuit and those made during the pendency of this lawsuit.

### Sixth Cause of Action
### Statutorily Prohibited Post-Employment Retaliation
### - Against Defendants Center and GHS Only -

106. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

107. Plaintiff has sought numerous employment opportunities following her termination from employment with third-party businesses.

108. Plaintiff has specifically been denied affiliations, privileges and employment with third-party businesses following her termination from employment because Defendants have conveyed, disseminated, and communicated false and untrue information about and concerning Plaintiff (for example, that she committed fraud while in the employ of Defendants).

109. Defendants have made false representations about and concerning Plaintiff as aforesaid by and through high-level management, human resources personnel, and without remedial guidance from Defendant's executive management - - all with the intent to harm Plaintiff further. This was done by the same personnel / management knowing of Plaintiff's legal claims.

110. Defendants actions were without privilege, made to third parties, not in the context of Plaintiff's employment, and caused Plaintiff specific injuries (loss of income, career, job opportunities, and emotional distress).

111. Plaintiff timely filed a Charge with the Equal Employment Opportunity Commission ("EEOC"), concerning post-employment retaliation. On November 8, 2018, counsel for the Parties agreed in the interest of judicial economy, that Defendants hereby waive the requirement of administrative exhaustion before the EEOC (and would not assert same as an affirmative defense regarding this specific filing or claim).

112. Plaintiff asserts in this Count that she has been subjected to post-employment retaliation by and through lost job opportunities specifically due to retaliatory references by Defendants.

113. Reference-giving and false-information disseminating personnel and management of Defendants expressly did so because of Plaintiff's protected activities under the FMLA, ADA, Title VII, and Equal Pay Act.  It is well established that such employment statutes prohibit post-employment retaliation concerning references.  *See e.g. Moreno-Nicholas v. City of Indianapolis*, 2000 U.S. Dist. LEXIS 16668 (S.D. Ind. 2000)(retaliatory references as post-employment retaliation are prohibited under employment statutes); *Roe v. McKee Mgmt. Assocs.*, 2017 U.S. Dist. LEXIS 23629 (E.D. Pa. 2017)(Title VII prohibits post-employment retaliation concerning references); *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194 (3d Cir. 1994)(post-employment retaliation concerning references causing loss of job opportunities is prohibited under anti-discrimination laws).

**Seventh Cause of Action**
**Violations of the Pennsylvania Human Relations Act ("PHRA")**
**-Against All Defendants-**

114. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

115. Plaintiff reasserts and re-alleges each and every allegation and claim as set forth in counts one, three and six[11], as such actions also constitute violations of the PHRA (as the PHRA contains the same protections as the ADA and Title VII, and are interpreted identically under Third Circuit jurisprudence.)

116. Defendant Greenberg is herein individually liable under count one and the cause of action for retaliation under count three, and Defendant Mahadevan is individually liable under counts one and three, because they aided, abetted and directly participated in the discriminatory/retaliatory conduct that was directed at Plaintiff.

117. These actions as aforesaid constitute violations of the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to be prohibited from continuing to maintain their illegal policy, practice or custom of discriminating/retaliating against employees and are to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto, as well as cease making further defamatory comments about or concerning Plaintiff;

B. Defendants are to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, retirement, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered retaliation/discrimination at the hands of Defendants until the date of verdict;

---

[11] Plaintiff adds the instant claims under the PHRA as her first three EEOC/PHRC charges pertaining to Counts one and three have been pending for at least one year. Defendants Center and GHS have agreed to waive administrative exhaustion pertaining to Count 6, which do not apply to the remaining Defendants.

C.      Plaintiff is to be awarded all available damages for her out-of-pocket costs, financial losses, and fees associated with time off from work, suspension, and/or referrals to the State for perceived impairment.

D.      Plaintiff is to be awarded liquidated and punitive damages, as permitted by applicable law(s) alleged asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

E.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

F.      Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

G.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

H.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:    */s/ Timothy S. Seiler*
         Ari R. Karpf, Esq.
         Timothy S. Seiler, Esq.
         3331 Street Road
         Two Greenwood Square
         Building 2, Ste. 128
         Bensalem, PA 19020
         (215) 639-0801

Dated: August 26, 2020